1  GREGORY CHARLES, ESQ., BAR NO. 208583
   CAMPEAU GOODSELL SMITH
2  440 North First Street, Ste. 100
   San Jose, California 95112
3  Telephone: 408.295.9555
   Facsimile: 408.852.0233
4  gcharles@campeaulaw.com

5  Counsel for Kasian Franks

6
7                UNITED STATES BANKRUPTCY COURT

                 NORTHERN DISTRICT OF CALIFORNIA
8
                       SAN JOSE DIVISION
9

10  IN RE:                          Case No.  09-52226-RLE-11

11  SEEQPOD, INC.
                      DEBTOR.       Hon. Roger L. Effremsky
12

13                                  DECLARATION OF GREGORY
                                    CHARLES  IN OPPOSITION TO
14                                  MOTION FOR DISCOVERY
                                    SANCTIONS
15
                                    Date: September 29, 2010
16                                  Time:
                                    Ctrm: 3099
17                                        280 South First Street
                                          San Jose, CA 95113-3099
18                                        Judge: Hon. Roger L. Efremsky

19
    I, Gregory J. Charles, declare and say:
20
         1.    I am an attorney at law duly licensed to practice before all of the courts of
21
    the State of California. I am a partner in the law firm of Campeau Goodsell Smith
22
    which is counsel for Excel Innovations, Inc. ("Excel"), plaintiff in these proceedings.
23
    This declaration is made on my personal knowledge.  If called as a witness, I would and
24
    could competently testify as follows.
25
         2.    Campeau Goodsell Smith ("CGS") is counsel for the debtor in this
26
    proceeding, and did not undertake representation of Mr. Franks until June 28, 2010
27
         3.    I hereby authenticate each exhibit attached hereto as a true and correct
28

copy of the original document.

4. Attached hereto as Exhibit 1 is correspondence from opposing counsel dated February 15, 2010.

5. Attached hereto as Exhibit 2 are portions of the transcript from the hearing dated March 24, 2010.

6. Attached hereto as Exhibit 3 are a series of emails that I either received or sent.

7. Attached hereto as Exhibit 4 are portions of Mr. Franks 2004 examination.

8. Attached hereto as Exhibit 5 are portions of the Mimvi 10Q for the quarter ending March 31, 2010.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of September, 2010 at San Jose, California.

                   s/Gregory J. Charles        

                   GREGORY J. CHARLES

# Exhibit 1

MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE

THIRTY-FIFTH FLOOR

LOS ANGELES, CALIFORNIA 90071-1560

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

————

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-2907

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

ROBERT K. JOHNSON¹
ALAN V. FRIEDMAN¹
RONALD L. OLSON¹
RICHARD S. VOLPERT
DENNIS C. BROWN¹
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
CHARLES D. SIEGAL
RONALD K. MEYER
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
STEVEN L. GUISE¹
ROBERT B. KNAUSS
STEPHEN M. KRISTOVICH
JOHN W. SPIEGEL
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
LAWRENCE C. BARTH
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
RONALD C. HAUSMANN
PATRICK J. CAFFERTY, JR.
JAY M. FUJITANI
O'MALLEY M. MILLER
SANDRA A. SEVILLE-JONES
MARK H. EPSTEIN
HENRY WEISSMANN
KEVIN S. ALLRED
BART H. WILLIAMS
JEFFREY A. HEINTZ
JUDITH T. KINARD
KRISTIN LINSLEY MYLES
MARC T.G. DWORSKY
JEROME C. ROTH
STEPHEN D. ROSE
JEFFREY L. BLEICH
GARTH T. VINCENT
TED DANE

STUART N. SENATOR
MARTIN D. BERN
DANIEL P. COLLINS
RICHARD E. DROOYAN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
MARY ANN TODD
MICHAEL J. O'SULLIVAN
KELLY M. KLAUS
DAVID B. GOLDMAN
BURTON A. GROSS
KEVIN S. MASUDA
HOJOON HWANG
KRISTIN S. ESCALANTE
DAVID C. DINIELLI
ANDREA WEISS JEFFRIES
PETER A. DETRE
PAUL J. WATFORD
DANA S. TREISTER
CARL H. MOOR
DAVID M. ROSENZWEIG
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
GREGORY J. WEINGART
TAMERLIN J. GODLEY
JAMES C. RUTTEN
J. MARTIN WILLHITE
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA
SEAN ESKOVITZ
FRED A. ROWLEY, JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
RANDALL G. SOMMER
MARIA SEFERIAN
MANUEL F. CACHÁN
ROSEMARIE T. RING
JOSEPH J. YBARRA
TODD J. ROSEN
SUSAN R. SZABO
NATALIE PAGÉS STONE

MONIKA S. WIENER
LYNN HEALEY SCADUTO
ERIC J. LORENZINI
KATHERINE K. HUANG
LINDSAY D. MCASKILL
KATE K. ANDERSON
ALISON J. MARKOVITZ
SUSAN TRAUB BOYD
JENNIFER L. POLSE
BRIAN R. HOCHLEUTNER
GRANT A. DAVIS-DENNY
JASON RANTANEN
REBECCA GOSE LYNCH
JONATHAN H. BLAVIN
KAREN J. EHRHARM
MICHELLE T. FRIEDLAND
LIKA C. MIYAKE
MELINDA EADES LEMOINE
ANDREW W. SONG
YOHANCE C. EDWARDS
JULIE D. CANTOR
SETH GOLDMAN
FADIA RAFEEDIE KHOURY
JOSHUA P. GROBAN
VICTORIA L. BOESCH
HAILYN J. CHEN
BRAD SCHNEIDER
GENEVIEVE A. COX
MIRIAM KIM
MISTY M. SANFORD
BRIAN P. DUFF
AIMEE FEINBERG
JOEL D. WHITLEY
KATHERINE L. HALL
KATHERINE KU
KIMBERLY A. CHI
SHOSHANA E. BANNETT
TINA CHAROENPONG
LEE S. TAYLOR
DEREK J. KAUFMAN
KIMBERLY D. ENCINAS
MARCUS J. SPIEGEL
GABRIEL P. SANCHEZ
BETHANY C. WOODARD
PAULA R. LEVY
DAVID C. YANG
WILLIAM E. CANO
HENRY E. ORREN

WESLEY SHIH
JACOB S. KREILKAMP
PAUL J. KATZ
JONATHAN M. WEISS
ELISABETH J. NEUBAUER
ERIC P. TUTTLE
HEATHER E. TAKAHASHI
KRISTINA L. WILSON
KEVIN A. GOLDMAN
ROBYN KALI BACON
BERNARD A. ESKANDARI
JENNY M. JIANG
KEITH R.D. HAMILTON, II
SORAYA C. KELLY
PATRICK ANDERSON
JEFFREY Y. WU
YUVAL MILLER
MARK R. CONRAD
ZACHARY A. BRAY
M. LANCE JASPER
ALISSA BRANHAM
ADAM R. LAWTON
PETER C. RENN
RACHEL L. STEIN
AVI BRAZ
PUNEET K. SANDHU
IAN J. MILLER
MARINA A. TORRES
JEREMY S. KROGER
DAVID S. HAN
DAVID C. LACHMAN
JENNY H. HONG
CUAUHTÉMOC ORTEGA
GUY A. RUB
AARON SEIJI LOWENSTEIN
DANIEL N. ELIZONDO
LAURA D. SMOLOWE
MELISSA CAMACHO-CHEUNG

RICHARD D. ESBENSHADE¹
ALLISON B. STEIN
PETER R. TAFT¹
SUSAN E. NASH
OF COUNSEL

E. LEROY TOLLES
(1922-2008)

¹A PROFESSIONAL CORPORATION

February 15, 2010

WRITER'S DIRECT LINE
(415) 512-4019
(415) 644-6919 FAX
Blanca.Young@mto.com

**VIA EMAIL AND U.S. MAIL**

Gregory J. Charles, Esq.
Campeau Goodsell Smith
440 N. 1st Street, Suite 100
San Jose, CA 95122

Re:     In re SeeqPod, Inc.

Dear Mr. Charles:

This letter follows up our prior communications regarding the production of documents by, and deposition of, Mr. Kasian Franks pursuant the Rule 2004 examination authorized by the San Jose Bankruptcy Court.

As you are aware, Mr. Franks' 2004 examination was initially set by court order for August 28, 2009, with a production of documents due on August 3, 2009. Due to Mr. Franks failure to produce documents timely, we were forced to postpone Mr. Franks' deposition. Pursuant to communications with you in September 2009, we understood that you would propose dates for the deposition and would produce documents that month. At your request, we also secured entry of a stipulated order that extends the protective order in the adversary proceeding to the 2004 examination. Despite these accommodations, no documents have been produced and no dates have been proposed for the deposition of Mr. Franks.

Continued non-compliance with the 2004 examination order and subpoena is unacceptable. Recent press reports indicate that Mr. Franks intends to launch a new internet music venture called "Mimvi" that apparently relies on the same technology that SeeqPod used.

Had we known of Mr. Franks' apparent plan to use intellectual property of the SeeqPod estate to launch a copy-cat infringing music service, we would have continued to persist in our demands to take his 2004 examination. As it was, we were led by the Trustee to believe that a sale of SeeqPod's assets in bankruptcy was forthcoming and that a deposition of Mr. Franks would not further our client's interests or the interests of the estate. Now it has become clear that a 2004 deposition is necessary to ascertain whether Mr. Franks is improperly using assets of the SeeqPod estate in violation of the automatic stay, in a manner that would impede or diminish the trustee's ability to sell estate assets, and/or as a consequence of a fraudulent or otherwise avoidable transfer.

Accordingly, it is imperative that the 2004 examination proceed. We hereby request that (1) responsive documents be produced no later than Monday, March 1, 2010 as directed in the subpoena; and (2) by no later than Friday, February 19, you propose dates during the last two weeks of March 2010 when Mr. Franks will appear for his deposition.

If we do not receive this information, we will raise this matter with Judge Effremsky at the status conference in the adversary proceeding scheduled for 10:30 am on March 4, 2010. Also, we reserve our rights to seek appropriate sanctions for Mr. Franks' continued non-compliance with court-ordered discovery.

We are available to meet and confer at your convenience if you wish to discuss these matters further.

Sincerely,

Blanca Young (by SG)

Blanca Young

cc:     Frank Scibilia, Esq. (by email)
        Seth Goldman, Esq. (by email)

# Exhibit 2

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ROGER L. EFREMSKY, JUDGE


In Re:                           ) Case No. 09-52226-RLE (7)
                                 )
SEEQPOD, INC.,                   ) <u>WARNER BROS. RECORDS'</u>
                                 ) <u>MOTION to COMPEL</u>
                Debtor.          ) <u>EXAMINATION under</u>
                                 ) <u>BANKRUPTCY RULE 2004</u>
                                 )
                                 )
                                 ) Wednesday, March 24, 2010
_____  ) San Jose, California


<u>Appearances via telephone</u>:

For the Movant/             Frank P. Scibilia, Esq.
Creditor:                   Jeffer Mangels Butler & Marmaro LLP
                            Two Embarcadero Center, Fifth Floor
                            San Francisco, California  94111-3824

                            Seth Goldman, Esq.
                            Munger, Tolles & Olson LLP
                            560 Mission Street, 27th Floor
                            San Francisco, California  94105-2907

For the Debtor:             Gregory Charles, Esq.


Digital Court               United States Bankruptcy Court
Recorder:                   Clerk of the Court
                            Peggy Sung
                            280 South First Street, Room 3035
                            San Jose, California  95113
                            (408) 278-7583


Certified Electronic        Palmer Reporting Services
Transcriber:                1948 Diamond Oak Way
                            Manteca, California  95336-9124


          Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

1          THE COURT:  Middle of May, really?

2          MR. CHARLES:  Yes.

3          THE COURT:  All right.  Well, you can send this

4    message to Mr. Franks from Judge Efremsky:  I'm not playing

5    games with him any longer.  We will go about, I will basically

6    deal with this today, but he has a very cavalier attitude and

7    it's going to cost him financially.  And I'm prepared to take

8    some other drastic measures and I may need the assistance of the

9    District Court, which if I make specific findings of facts and

10   conclusions of law and the request that the District Court issue

11   an appropriate order that will call for a U.S. Marshal to go out

12   and arrest him if he needs to appear at an examination, but it's

13   certainly going to happen well in advance of May.

14          And I don't care how important he thinks he is, this

15   is a federal court and he needs to adhere to the processes.  So

16   I would appreciate it if you would communicate that to him in

17   writing.

18          Now with that being said, Mr. Charles, do you have any

19   suggestions to move this along in an expeditious matter to get

20   your client's attention other than doing that type of a letter

21   to him?

22          MR. CHARLES:  Again, he's not my client, Your Honor,

23   but I will adhere to the Court's wishes that you — that I

24   communicate that to him —

25          THE COURT:  Okay.  Well, he's your responsible

Case 09-52286  Doc# 8906  Filed 04/09/05  Entered 04/09/05 22:29:35  Page 5 of 21
Case 09-52286  Doc# 8906-1  Filed 04/09/05  Entered 04/09/05 22:29:35  Page 5
of 36

1  individual and so unless you have somebody else you're

2  communicating, he's it. And I realize you don't personally

3  represent him, but I need someone to try to get ahold of him as

4  counsel.

5  And, again, I'm not trying to put you on the hot seat,

6  but obviously this gentleman doesn't get it —

7  MR. CHARLES: No, I've agreed to do that, Your Honor.

8  I've agreed to do that. I would suggest that — you know, wait.

9  You know, Your Honor, they could propose some dates, but —

10  THE COURT: I think what they're going to do is I'm

11  going to give a date and he better be there, is what needs to be

12  done. This is not — I'm not — we're not in a negotiation phase

13  anymore —

14  MR. CHARLES: No, I understand that, Your Honor.

15  But —

16  THE COURT: I'm not mad at you, Mr. Charles. What I'm

17  just simply saying is that this isn't an issue of proposing

18  dates. The gig's up.

19  MR. CHARLES: Well, I understand that, Your Honor.

20  But in fairness to Mr. Franks, he was not served with a copy of

21  this motion. This matter sat in abeyance for well over six

22  months. This is a case in Chapter 7 right now. I don't know

23  that counsel for the trustee wants to take this examination and

24  — and I don't necessarily agree that he has this cavalier

25  attitude. I mean this case has been on the backburner forever

1    and — and nothing was done until I got a call where I

2    specifically said that I was not Mr. Franks' lawyer, and you say

3    he's the responsible person, I understand that, but we've got a

4    Chapter 7 trustee.  And the Chapter 7 trustee has no interest in

5    taking Mr. Franks' examination with respect to this issue.

6              So I don't know that he's being cavalier and I don't

7    know that — that all these things are happening, but I'm willing

8    to try to facilitate this.  But I don't necessarily agree with

9    the characterization of what's happening.

10             THE COURT:  All right.  Well, okay, —

11             MR. CHARLES:  I mean this case has sat dead in the

12   water.

13             THE COURT:  All right.  Mr. Charles, that's fine.

14   Thank you.

15             Mr. Goldman and Mr. Scibilia, you've done this

16   vis-a-vis a 2004 examination, and there's an adversary action on

17   file.  Perhaps what it would be best to do would be to notice

18   his deposition and a production of documents as to him

19   individually.  And then there's no issue about him, whether he's

20   a responsible individual.  He's not the debtor, because I think

21   as a responsible individual, I don't know if I can exercise my

22   rights to have a U.S. Marshal go out and get him.  I don't — I

23   have not had an opportunity to look at that issue.

24             But — and I'm not taking sides whether your side's

25   correct, Mr. Franks is correct.  My point is simply I don't get

Case: 09-52226   Doc# 806-1   Filed: 09/15/16   Entered: 09/15/16 22:29:38   Page 10 of 36

1   the impression that Mr. Franks is taking these proceedings

2   seriously. And I do — I'm sorry, Mr. Charles, but I think he is

3   taking a very cavalier approach to this.

4           So, Mr. Goldman and Mr. Scibilia, wouldn't it be

5   better to actually notice — serve him with a deposition notice

6   and a production of documents, and deal with it in that way

7   within these proceedings of the adversary action?

8           MR. GOLDMAN: Excuse me. Well, let me say a couple of

9   things in response to that, Your Honor. The one is that we have

10  served a subpoena pursuant to Rule 45, pursuant to the order

11  approving the Rule 2004 examination. And it's directed towards

12  things that relate to the administration of the estate, which is

13  the purpose of the examination.

14          And back in June when this first came up we understood

15  that the trustee was not inclined to proceed further to examine

16  Mr. Franks. And we were invited to — to make a motion under

17  Rule 2004 to get that information in aid of primarily the

18  administration of the bankruptcy estate.

19          THE COURT: Um-hum.

20          MR. GOLDMAN: The adversary proceeding is stayed. And

21  I'm not sure that the trustee is willing to sort of unstay that

22  for the purpose of issuing a subpoena, but if that's the

23  Court's —

24          THE COURT: Well, here's — here's my point. I can

25  appreciate where the trustee's counsel doesn't want to spend

Case: 09-52226   Doc# 806-1   Filed: 09/15/16   Entered: 09/15/16 22:29:38   Page 11
of 36

1    time or money in this thing.  But what I'm really getting from

2    your — from your clients is they're very concerned about what

3    he's doing with not just from the assets of the estate, because

4    there's probably not going to be that much money into the estate

5    here.  You're concerned about him opening up another company

6    that's going to have the same effect that you guys — you all

7    complained about against SeeqPod.  And maybe what needs to be

8    done is to proceed with the litigation and do away with the stay

9    of the litigation and take his deposition, do a request for

10   production of documents, and proceed with that route.

11            Then I don't have to have a problem, where I don't

12   have an actual — I can exercise additional powers that I have if

13   you go after him individually.  But that's my suggestion on

14   this.  Unless you have some other thoughts on here, but you're —

15   we're not — we obviously don't —

16            MR. GOLDMAN:  Well, —

17            THE COURT:  — have Mr. Franks' attention on this.

18            MR. GOLDMAN:  Right.  Well, I guess I would say that

19   Franks is not a defendant in the — in the adversary proceeding.

20            THE COURT:  Maybe —

21            MR. GOLDMAN:  And —

22            THE COURT:  — he needs to be a defendant in another,

23   maybe not an action pending in the Bankruptcy Court, maybe he —

24   if you've got issues with him, maybe it's another action,

25   whether it be in state court or federal court, I don't know.

1    But I've got a trustee.  I assume if it was documents you want

2    to review, I would assume the trustee has those documents with

3    trustee's — you know, counsel for trus- — or with the trustee's

4    counsel, that, you know, Barry Milgrom has those documents.  If

5    not, I guess my question would be why not.

6              Maybe you can shed some light for the Court.  What is

7    it that you want from Mr. Franks that the trustee doesn't have?

8              MR. GOLDMAN:  Well, I think we with like to understand

9    his dealings with the estate, if he has any property and if he's

10   using it currently.  And I think we would like to understand

11   what impact, if any, Mr. Franks' conduct may have on a sale of

12   the — excuse me — a sale of the assets.

13             You know, we had hoped that we would not need to go

14   forward with this examination because we understood from the

15   trustee that a sale might be pending back in the fall.  And so

16   we sort of held off.  I mean we didn't want to be in this

17   situation, to force the Court to take action if we didn't need

18   to.  But the recent events that we noted in the motion to compel

19   suggest that it would be appropriate to go forward with the

20   examination.

21             And I would like to reiterate that, you know, Mr.

22   Franks has not provided a single date.  He's never proposed a

23   single date to us for his deposition.  And it may be that he has

24   no documents.  And if that's the case it will be easy for him to

25   comply with that aspect of the 2004 examination.

Case: 09-52226   Doc# 196-1  Filed: 04/09/10  Entered: 04/09/15 16:21:27:33  Page 10 13
of 36

1        THE COURT:  Have you spoken with Mr. Milgrom about

2   what documents that he has or has he requested documents from

3   Mr. Franks and not received those or from Mr. Charles, counsel

4   for SeeqPod?

5        MR. GOLDMAN:  I — as I understand it, Mr. Milgrom has

6   received the documents that he has requested, but I don't know

7   in detail how much he has requested.

8        THE COURT:  Wouldn't it be appropriate that if you

9   could see what he's requested, what he's received, you might get

10  the documents you're looking for as well as what Mr. Charles

11  has, just make a request of Mr. Charles?

12       I don't — Mr. Charles, do you have any documents of

13  SeeqPod in your possession?

14       MR. CHARLES:  The documents were turned — I do not

15  personally have documents in my possession.  The only documents

16  that came into my possession, Your Honor, were those relating to

17  the adversary proceeding.  All other documents that we had went

18  to Mr. Milgrom.  And it's my understanding that Mr. Franks

19  provided everything that he had to Mr. Milgrom and actually

20  worked with Mr. Milgrom on — on the proposed sale.

21       I also note that I believe that Mr. Milgrom had taken

22  the position that to the extent that the movants were seeking

23  documents relating to the estate, that they should run that by

24  Mr. Milgrom first as opposed to going directly to Mr. Franks.

25  And I don't know whether that was done or not.

Case: 09-52226   Doc# 196-1 Filed: 04/09/10 Entered: 04/09/10 21:47:33 Page 14
of 36

1       THE COURT:  I don't know.  And it would seem to be

2   logical to me that if documents have been produced to the

3   trustee's counsel that, Mr. Goldman, someone would have made a

4   request on Mr. Milgrom to provide copies of those documents so

5   that you could review them and find out if he has, in fact,

6   said, 'Give me all your documents,' and have some sort of

7   certification to that effect, that he has all the documents,

8   rather than trying to trace Mr. Franks around.

9       I don't like what Mr. Franks is doing.  I get the

10  impression he's just ignoring everybody.  And I know you have

11  attempted to try to set up dates to take his deposition or his

12  examination — do an examination of him.  But maybe it's —

13      MR. GOLDMAN:  He —

14      THE COURT:  — going to take doing away with the stay

15  of the litigation and notice his deposition in the adversary

16  action.  I realize he's not a party, he's not a named defendant,

17  but you can certainly take his deposition there.  And maybe

18  that's more appropriate.  And maybe that will get his attention.

19  To the extent he's communicating with Mr. Milgrom, that if the

20  trustee realizes they're going to have to spend some time and

21  money dealing with that aspect of it, maybe that's the

22  appropriate way.  But I'm not convinced that doing a 2004

23  examination, asking him to produce documents if, in fact, he's

24  produced everything already to Mr. Milgrom, you might be able to

25  get exactly what you want from Mr. Milgrom, especially since you

Case: 09-52226   Doc# 196-1 Filed: 04/09/10  Entered: 04/09/15 16:21:27  Page 15
of 36

1   haven't asked Mr. Milgrom yet.

2           MR. SCIBILIA:  This is Frank Scibilia, Your Honor.

3   May I raise a couple of points?

4           THE COURT:  Please.

5           MR. SCIBILIA:  I'm certainly — I have no objection to

6   asking Mr. Milgrom, you know, for particular documents, but sort

7   of the history of this is that — one of the things we're dealing

8   with here is not really so much the — the infringement that

9   occurred that's the subject of the adversary proceeding, but

10  what Mr. Franks has been doing or claims in public documents to

11  be doing with assets of the estate.

12          And I have raised — you know, first we learned that

13  the estate that he was going to be selling, you know, the

14  SeeqPod domain name, which was quite surprising to us because we

15  thought that belonged to the estate, and we raised the issue

16  with the trustee.  The trustee informed us that that had

17  actually been, you know, fraudulently transferred to an entity

18  called Geneva Research, which was not disclosed in Mr. Franks'

19  statement to the Court regarding the assets, okay.

20          So then — and the trustee said, you know, 'So we have

21  no' — the trustee had no control over that domain name anymore,

22  okay.

23          Then I raised that issue with the District Court in

24  New York, because we actually had — the EMI plaintiffs actually

25  had a complaint on file not only against SeeqPod but against Mr.

Case: 09-52226   Doc# 196-1 Filed:04/09/10 Entered:04/09/15 16:21:29:33 Page 16 of 36

1   Franks personally in the Southern District of New York.

2           And I raised — and what happened was there was a stay

3   of course against SeeqPod, but there was actually a motion to

4   dismiss on behalf of Mr. Franks.  And when the motion was

5   pending, I raised this issue with the federal court in a

6   declaration and said, you know, Mr. Franks is basically the

7   primary actor here.  He — he's running around selling these

8   assets that he says he doesn't control.  They actually are in

9   the custody of him, and he denied that in a statement to the

10  federal court.

11          In a sworn declaration he said:  Oh, no, the SeeqPod

12  domain name is actually under the control of the trustee, which,

13  you know, was completely at odds with what the trustee had told

14  us.  And, as a result of that, you know, the motion, the case

15  against him was dismissed, okay.  And we just haven't, you know,

16  decided to pursue that any further with him in New York because,

17  you know, we can't even find him in this adversary proceeding.

18          So — so he's really — you know, the issues here, he's

19  saying one thing to the trustee and he's saying something else

20  to the Southern District of New York.  And all of this relates

21  not so much to the infringement that occurred but to what he is

22  doing.

23          And the control of the domain name is very important

24  because changes continue to be made to the website, and they

25  shouldn't be.  And the trustee says, 'I have no idea, I'm not

Case: 09-52226   Doc# 196-1 Filed: 04/09/10 Entered: 04/09/15 16:21:29:33 Page 4 17 of 236

1  making the changes.'  So somebody must be making the changes.

2  And those changes are linking to other infringing websites and,

3  presumably, eventually will infringe to his new website.

4         So, you know, I'm not sure exactly whether or not

5  pursuing him in the adversary proceeding is really — in a

6  deposition the topics won't necessarily relate to the prior —

7  the prior infringement, or I guess they will touch upon that.

8  But they're sort of separate topics.

9         THE COURT:  Well, then what about bringing a motion to

10 lift the stay, making a motion to — or not a motion, because I

11 don't think anybody's responded, but amending the adversary

12 action to not only deal with past infringement but potentially

13 present and future infringements and just proceed with it?

14         Because what I'm — what I'm really hearing is you're

15 concerned about infringement in the past, present, potentially

16 in the future that adversely affects your client's artists, your

17 clients as the record producers, and that he's apparently got

18 himself out of the action in the Southern District of New York

19 District Court.  You say he's filed a document there that

20 contradicts what he told Mr. Milgrom.  I assume you've provided

21 that document to Mr. Milgrom, saying that to the extent you

22 didn't have control over the SeeqPod domain name, he's filed a

23 declaration with the Southern District of New York District

24 Court saying just the opposite, that it is in fact under your

25 control.  I'd be curious to see, like to know what the trustee's

Case: 09-52226   Doc# 196-1 Filed: 04/09/10 Entered: 04/09/10 21:19:33   Page 18
of 36

1   doing.

2          But I think this is all about infringement, whether in

3   the past, present, or into the future.  And if Mr. Milgrom's

4   trying to sell this it may be, you know, that he's very

5   sensitive about the money that's going to be expended because if

6   he knows he can't get that much money, he doesn't want to spend

7   a lot of time because it kind of defeats the whole purpose, and

8   again I'm sympathetic to that.  But, on the other hand, you've

9   got a guy out there who apparently he's not cooperating here

10  with the Court and he's going on.  You have concerns.  And I

11  don't know what he's doing.  I don't know with NIMBY, if it — if

12  it's utilizing the technology that was involved in SeeqPod, I

13  don't know.

14         But, Mr. Goldman, Mr. Scibilia, tell me, you know,

15  give me something.  Check with the trustee, see what documents

16  he has.  If it's just looking at documents and he's got

17  everything you need, that might solve the problem.  You don't

18  need to take his — do an examination of him.

19         On the other hand, it sounds like what you really want

20  to find out is what the heck is he doing now with this new

21  company and that he may be potentially infringing upon your

22  client's artists as well as the record companies.

23         Am I missing something?

24         MR. GOLDMAN:  No.  Well, this is Seth Goldman.  I

25  think that that's right to a large degree, but I think there are

Case: 09-52226   Doc# 896-1   Filed: 04/09/10   Entered: 04/09/15 16:21:27:33   Page 6 19
of 36

1  a couple of other aspects.  The one is to the extent to which

2  he's using a state property and in particular the extent to

3  which this could impact a sale.

4         I mean as a creditor of the estate we are still

5  interested in facilitating a sale of the assets for the highest

6  value.  And, you know, —

7         THE COURT:  But, Mr. Goldman, I have to say I'm not

8  buying that.  I don't see as your real concern because the

9  amount of money that I'm led to believe is involved here is

10 peanuts.  And if the trustee's counsel is not all worked up

11 about it, for — to have counsel for the record companies coming

12 in and saying, 'We're really concerned, we want to see the

13 estate maximize the assets,' I'm not buying it.

14         I think the real issue here is infringement.  And I'm

15 sympathetic to it.  I want — you know, —

16         MR. GOLDMAN:  Can I also make one other suggestion,

17 Your Honor?

18         THE COURT:  Yes.

19         MR. GOLDMAN:  That is that under Rule 2005 the Court

20 has the power to order the debtor, which is defined in Rule

21 9001, includes, I believe, responsible individuals to comply

22 with Rule 2004 examinations.  And we would be willing to go

23 through the trustee for documents, provided that a deposition

24 date is set and we have the ability to depose Mr. Franks.  And

25 if documents are not available or become necessary following

Case: 09-52226   Doc# 896-1   Filed: 04/09/10   Entered: 04/09/10 21:27:33   Page 7 20
of 36

1  that examination, then we could discuss with the Court how best

2  to proceed to get those documents.

3          THE COURT:  Okay.  Here's my suggestion.  Mr. Charles,

4  if you'd be kind enough to write that letter to Mr. Franks, and

5  again I appreciate the fact that you don't represent him.  He is

6  the responsible individual, but let him know —

7          MR. CHARLES:  I will be, Your Honor.  And I also just

8  want to note for the record that I don't have authority to do

9  anything in the Chapter 7 case, but since as an officer — since

10  you've directed me to do it, I will do it.

11          THE COURT:  Just say that Judge Efremsky's made that

12  request and if you could — even if it's just let to him know

13  that he needs to appear in this Court or to cooperate in having

14  his examination, and that the Judge is not inclined to put this

15  thing out to May.  That's one.  So if you could be kind enough

16  to send him a letter to that effect, the Court would be greatly

17  appreciative of that.

18          Two, —

19          MR. CHARLES:  I will do that, Your Honor.

20          THE COURT:  — Mr. Goldman and Mr. Scibilia, my

21  suggestion is contact Mr. Milgrom, ask him to provide you with

22  copies of the documents that he has received.  I would hope that

23  you would be able to make copies at your expense, but all

24  documents so that you could review.  Review them, assuming he

25  can produce them immediately.

Case: 09-52226   Doc# 196-1 Filed: 04/09/10  Entered: 04/09/10 16:21:33   Page 21
of 36

 1          And then what we can do is I can give you a — I'll put
 2    this over a few weeks and we'll take it up at that juncture and
 3    possibly the interim.  Maybe Mr. Franks will contact you and
 4    make arrangements.  But at that point I can take it up and see
 5    if I want to issue a further order.  But you have my attention
 6    as to what's going on here.  I'm just trying to figure out the
 7    most efficient way to skin this cat.
 8          Do you have any other thoughts, because what I'm — my
 9    question would be how much time do you need.  I can put this
10    over — I could put this over to April 14th.
11          MR. GOLDMAN:  That — that would be fine for us, I
12    think.
13          Frank, do you agree?
14          MR. SCIBILIA:  Definitely.
15          THE COURT:  Okay.  So I'm going to continue this
16    hearing to the 14th at 10:30.  In the interim contact Mr.
17    Milgrom.
18          MR. CHARLES:  Keep in mind, Your Honor, I am — I am on
19    vacation that week, and so to the extent you want me to
20    participate I am — I will be out of town.
21          THE COURT:  Is this Mr. Charles?
22          MR. CHARLES:  It is, Your Honor.
23          THE COURT:  All right.  Now that's — you were kind
24    enough to take the Court's call.  I appreciate it.  So I'm not
25    looking for you to appear.  You don't represent him.  And so if

Case: 09-52226   Doc# 196-1 Filed: 04/09/10 Entered: 04/09/10 16:21:27 Page 22 of 36

1    you're kind enough just to send that letter, that will be

2    sufficient.  So thank you.

3              MR. CHARLES:  And I will pass that onto Mr. Franks.

4              THE COURT:  Very good.

5              And I would suggest to counsel for the movants to send

6    out a notice of continued hearing to the 14th of April at 10:30.

7    Contact Mr. Milgrom in the interim.  See if you can arrange

8    those and then you can discuss with Mr. Milgrom and that Judge

9    Efremsky is — will consider lifting the stay on the litigation

10   so that you can go forward and notice the deposition.

11             I'm also going to take a look at the issue of whether

12   the 2004 examination is the appropriate method here versus a

13   deposition.  Again, my concern is I really see to be an

14   infringement issue for you and it might — I think the deposition

15   might be the appropriate way to go, but I'm going to take a look

16   at that.  And I'll be prepared to deal with this on the 14th of

17   April.

18             Gentlemen, anything else that you can — you want the

19   Court to consider?

20             MR. GOLDMAN:  No, Your Honor.  Thank you.

21             MR. SCIBILIA:  No, Your Honor.  Thank you very much.

22             THE COURT:  All right.  Thank you.

23             MR. CHARLES:  Thank you, Your Honor.

24        (The hearing was concluded at 11:58 o'clock a.m.)

25                            —o0o—

Case: 09-52226   Doc# 196-1 Filed: 04/09/10 Entered: 04/09/15 16:21:27:33 Page 20 23
of 236

State of California            )
                              )       SS.
County of San Joaquin         )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of California, of the
proceedings taken on the date and time previously stated in the
above matter.

        I further certify I am not a party to nor in any way
interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
through the American Association of Electronic Reporters and
Transcribers, Certificate No. 00124.  Palmer Reporting Services
is approved by the Administrative Office of the United States
Courts to officially prepare transcripts for the U.S. District
and Bankruptcy Courts.


                                    Susan Palmer
                                    Palmer Reporting Services

                                    Dated April 8, 2010

# Exhibit 3

IRS CIRCULAR 230 NOTICE: Any tax advice given herein (and in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any matter or transaction addressed herein.

**From:** Scibilia, Frank P. [mailto:FScibilia@PRYORCASHMAN.com]
**Sent:** Friday, April 09, 2010 2:50 PM
**To:** 'Greg Charles'
**Cc:** Young, Blanca; 'Goldman, Seth'; Levy Jr., Richard; Zakarin, Donald S.
**Subject:** RE: Kasian Franks

Thanks, Greg. I do not believe we served any papers on you since the last hearing.

Since you did, in fact, communicate with Mr. Franks, did he tell you whether he will be attending the April 14 hearing, either alone or with counsel? Is it fair to assume from your e-mail that Mr. Franks proposed no dates earlier than the second week of May, even though the Court found objectionable his reluctance to appear sooner? Did he propose any specific dates "after the 2nd week of May?"

Frank P. Scibilia | PRYOR CASHMAN LLP
7 Times Square | New York, New York 10036-6569
Direct Dial: (212) 326-0445 | Direct Fax: (212) 798-6375 | Cell: (917) 885-7001
fscibilia@pryorcashman.com | www.pryorcashman.com

**From:** Greg Charles [mailto:gcharles@campeaulaw.com]
**Sent:** Friday, April 09, 2010 5:41 PM
**To:** Scibilia, Frank P.
**Subject:** RE: Kasian Franks

Frank

Sorry for the delay. I have communicated with Mr. Franks but have not been retained by him. In this regard, I note that serving motion papers upon me is completely ineffective for any issue that you may have with Mr. Franks. As the Court asked, however, I am willing to facilitate this process. As I noted at the original hearing on this matter, Mr. Franks is still willing to be deposed after the 2nd week of May.

Gregory J. Charles, Esq.
CAMPEAU GOODSELL SMITH, LC
440 North 1st Street, Ste. 100
San Jose, California 95112
Tel: 408.295.9555, ext. 109
Mobile: 408.493.0363
Fax: 408.852.0233
gcharles@campeaulaw.com

PRIVILEGED AND CONFIDENTIAL: The information contained in this e-mail and any attached documents are confidential, and may be an attorney-client communication subject to the attorney-client or work product privilege. If you are not the intended recipient or the person responsible for delivering the message to the intended recipient,

| From: | Greg Charles [gcharles@campeaulaw.com] |
|---|---|
| Sent: | Friday, April 09, 2010 3:41 PM |
| To: | 'Scibilia, Frank P.' |
| Subject: | RE: Kasian Franks |

I'll be glad to help out.

---

**From:** Scibilia, Frank P. [mailto:FScibilia@PRYORCASHMAN.com]
**Sent:** Friday, April 09, 2010 3:30 PM
**To:** 'Greg Charles'
**Subject:** RE: Kasian Franks

Thanks, Greg. If we choose to accept that offer, can we coordinate the exact date through you?

Frank P. Scibilia | PRYOR CASHMAN LLP
7 Times Square | New York, New York 10036-6569
Direct Dial: (212) 326-0445 | Direct Fax: (212) 798-6375 | Cell: (917) 885-7001
fscibilia@pryorcashman.com | www.pryorcashman.com

---

**From:** Greg Charles [mailto:gcharles@campeaulaw.com]
**Sent:** Friday, April 09, 2010 6:27 PM
**To:** Scibilia, Frank P.
**Subject:** RE: Kasian Franks

Frank:

Seth actually served the revised notice of hearing on me electronically on March 24, so I wanted to make my position clear. I have spoken to Mr. Franks and simply conveyed his offer to you. I have no further specifics.

Gregory J. Charles, Esq.
CAMPEAU GOODSELL SMITH, LC
440 North 1st Street, Ste. 100
San Jose, California 95112
Tel: 408.295.9555, ext. 109
Mobile: 408.493.0363
Fax: 408.852.0233
gcharles@campeaulaw.com

PRIVILEGED AND CONFIDENTIAL: The information contained in this e-mail and any attached documents are confidential, and may be an attorney-client communication subject to the attorney-client or work product privilege. If you are not the intended recipient or the person responsible for delivering the message to the intended recipient, any review, disclosure, copying, distribution, or use of the contents of this e-mail or any attached document is strictly prohibited. If you have received this e-mail in error, please destroy it and notify the sender immediately by telephone (408.295.9555) or e-mail.

# Exhibit 4

0217

1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5   In re                    ) CASE NO.: 09-52226-RLE-7

6       SEEQPOD, INC.        )

7          Debtor.           )

8

9

10

11

12

13

14

15              VOLUME III

16   VIDEOTAPED 2004 EXAMINATION OF KASIAN FRANKS

17          PAGES 217 THROUGH 322

18        SAN FRANCISCO, CALIFORNIA

19              JUNE 30, 2010

20

21

22

23

24

25   REPORTED BY:  MICHAEL CUNDY, CSR 12271

1   somewhere?

2      A    Correct.

3      Q    And what website is that?

4      A    Mimvi.com.

5      Q    How is Mimvi funded?

6      A    Investors.

7      Q    Are those private investors?

8      A    Private and public.

9      Q    Is it traded on a stock exchange?

10     A    It will be.

11     Q    It's not currently traded on a stock exchange?

12     A    Let me correct that.  It is traded on the stock

13   exchange but not trading.

14     Q    So have you done SEC registrations and things like

15   that for Mimvi then?

16     A    Correct.

17     Q    And I take it there's been no IPO as of yet?

18     A    There has been what's called an alternative IPO.

19     Q    Okay.  When did that happen?

20     A    That process happened during a matter of months

21   from January to March.

22     Q    And very briefly, what does that -- what does an

23   alternative IPO involve?

24     A    It involves acquiring a publicly traded company

25   and changing out its operations, changing its name.

0275

1    A    That's up to Apple and Google.

2    Q    And how do you mean?

3    A    It's how Apple and Google negotiate with their

4    application developers, whether or not the app is free.

5    It's largely up to the app developer and Apple.

6    Q    So would you be finding applications that are

7    available on Google or Apple's websites?

8    A    No, on the -- applications that are available on

9    Google's phone, like the Nexus 1 or the Android phones or

10    the iPhone or iPad.

11    Q    So has Mimvi put in place anything to make sure

12    that whoever came up with the application is compensated

13    for it?

14    A    That's Apple's job.  That's not Mimvi's job.

15        Mimvi provides a search interface for these apps,

16    and what that means is if an app developer develops a

17    mobile app, they submit it to the Apple approval process.

18        And once that happens, Apple's the one that takes

19    a 30-percent revenue cut from that mobile app developer.

20    The developer takes the rest.

21    Q    Have you -- has Mimvi engaged in discussions with

22    Apple and Google?

23    A    No, but we do intend to open a dialogue with

24    Apple.

25    Q    And in the interim, is Mimvi doing anything to

0276

1  ensure that Apple gets compensation for the mobile apps

2  that it developed that Mimvi is going to help people find?

3     A    Apple gets 30 percent from any app developer that

4  develops an app that's available on the iPhone.

5     Q    And -- so would Apple and the developer get paid

6  for the content that Mimvi is going to be locating for

7  people?

8     A    No.  The app developer will either choose to give

9  away their app for free or the app developer will sell

10  their app, and so if an app developer sells its app, Apple

11  makes money and the app developer makes money.

12     Q    And you are simply linking people to wherever that

13  app exists; right?

14     A    Correct.

15     Q    So if that app had been stolen by somebody, Mimvi

16  would still link to the stolen app?

17     A    That's incorrect.

18     Q    Okay.

19     A    Apple provides us -- Apple provides the world with

20  a database of mobile apps, and so does Google.

21        Mimvi enables people to search through those

22  databases.

23     Q    Okay.  Does Mimvi use any filtering to make sure

24  that it's not linking people to apps that have been stolen?

25     A    We've never found an app that has been stolen.

1  That actually doesn't fit the context of the mobile app

2  market.  Nobody can steal a mobile app.

3      Q    Okay.  And can you explain that to me briefly?

4      A    Yeah.  So if -- if an app developer develops an

5  app, they submit it to Apple, and Apple looks at it and

6  says, Okay, I'm going to put it in my app store.

7          And then people with iPhones, for this example,

8  would go to the Apple iPhone apps store and then download

9  the app, either pay for it or they would receive it for

10  free, so in that process, no one is stealing any mobile

11  apps.

12          So once you download a mobile app to your phone,

13  it's from Apple to your phone directly, so there's no way

14  anybody can really steal a mobile app.

15      Q    So is Mimvi offering its own app store, basically?

16      A    No.  We're just offering a search interface to

17  help people find apps.  That's it.

18      Q    So if -- if someone were to search using Mimvi,

19  would they be redirected to the Apple app store?

20      A    Absolutely, yes.

21      Q    And that's where they could purchase the app?

22      A    Yeah, exactly.

23      Q    Okay.

24      A    And we could, you know, provide a demo or

25  screenshots, if you want, on how that might work.

# Exhibit 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)

[X]        QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF
1934

For the quarterly period ended: <u>March 31, 2010</u>

Or

[  ]        TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF
1934

For the transition period from _____ to _____

Commission File Number: 333-153826



<u>**MIMVI, INC.**</u>
(Exact name of registrant as specified in its charter)

FASHION NET, INC.
(Former Name If Applicable)

<u>Nevada</u>                                                    <u>26-0685980</u>
(State or other jurisdiction of incorporation or organization)        (I.R.S. Employer Identification No.)

222 Columbus Ave, Suite 410,
<u>San Francisco, CA</u>                                          <u>94133</u>
(Address of principal executive offices)                        (Zip Code)

<u>510-552-2811</u>

Case: 09-52226    Doc# 106-1    Filed: 09/15/10    Entered: 09/15/10 22:29:33    Page 35
of 36

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Forward-Looking Statements

This Quarterly Report contains forward-looking statements about the Company's business, financial condition and prospects that reflect management's assumptions and beliefs based on information currently available. We can give no assurance that the expectations indicated by such forward-looking statements will be realized. If any of our management's assumptions should prove incorrect, or if any of the risks and uncertainties underlying such expectations should materialize, the Company's actual results may differ materially from those indicated by the forward-looking statements.

The key factors that are not within our control and that may have a direct bearing on operating results include, but are not limited to, acceptance of our services, our ability to expand our customer base, managements' ability to raise capital in the future, the retention of key employees and changes in the regulation of our industry.

There may be other risks and circumstances that management may be unable to predict. When used in this Quarterly Report, words such as, *"believes," "expects," "intends," "plans," "anticipates," "estimates"* and similar expressions are intended to identify forward-looking statements, although there may be certain forward-looking statements not accompanied by such expressions.

### Management's Discussion and Analysis and Results of Operation

We were incorporated in Nevada on August 7, 2007. We are a development stage company and have not yet realized any revenues since our formation. Mimvi is a technology company that develops advanced algorithms and technology for personalized search, recommendation and discovery services to the consumer and enterprise. Mobile applications are the new "websites" and mobile devices are the new "browsers". Our technology excels at helping people search for and find personalized mobile apps such as iPhone apps, Google Android apps, Windows Mobile apps, Symbian apps and many others.

A multi-billion dollar revenue difference exists that favors leading search engines over leading social networks. Our business combines the value of search engines and social networks to provide the world's largest personalized search and recommendation engine for mobile applications and videos.

We have developed cognitive computing technology which is the basis for its personalized search and recommendation platform. This technology mimics the way humans' process information. Using this technology to analyze information, searches on search engines and similar tastes found on social networks around the world, our business provides powerful personalized search, discovery, recommendation algorithms and additional technology platforms. This technology is currently applied to automatically organize the world's mobile apps and videos for consumers and enterprises such as Google, Apple, Baidu, NetFlix and Amazon.

While standard search algorithms require a lot of active work on the users part, our cognitive computing algorithms are designed to automate the search, discovery and recommendation process with personalization technology. This works especially well when users want to passively, similar to watching TV, interact with content on the Internet or within the enterprise.

Our technology platforms enable addictive and exhilarating consumer web experiences. These consumer web experiences are defined by simplicity and power. The world's general social networks and search engines have commoditized information making it ripe for the application of our technology. The value in this information comes from it being intelligently organized.

Our strategists understand that consumers need services that simplify their daily routines as opposed to making them more complex. This strategy wrapped around a platinum class of advanced search algorithms and technology provides relevant search results without having to actively search for apps, entertainment and product recommendations. Powerful automated discoveries add to a higher quality of life that can inspire and be shared with family and friends. By achieving this, the Company's product becomes a part of the consumer's daily lives.

In the three months ended March 31, 2010, we incurred a net loss in the amount of $8,493, classified as general and administrative expenses. During the comparable period ended March 31, 2009, our net loss totaled $500 in general and administrative expenses. Our net loss in the current period ended March 31, 2010 was higher than in the prior year due primarily to consulting fees. Since our inception, aggregate expenses were $41,732, consisting of $10,000 in executive compensation paid to a former

Case: 09-52226   Doc# 106-1   Filed: 09/15/10   Entered: 09/15/10 22:29:33   Page 36 of 36